UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
GENGHIS KHAN,

                            Petitioner,

          -against-

MICHAEL CAPRA,

                           Respondent.

-------------------------------------------------------------X

**REPORT AND
RECOMMENDATION**

18 Civ. 1967 (CS)(JCM)

To the Honorable Cathy Seibel, United States District Judge:

      Petitioner Genghis Khan ("Petitioner"), proceeding *pro se*, filed a petition for a writ of

habeas corpus pursuant to 28 U.S.C. § 2254 on February 12, 2018 ("Petition").[1] (Docket No. 2 at

22).[2]  On July 10, 2018, Respondent Michael Capra ("Respondent") opposed the Petition,

(Docket No. 14), accompanied by a supporting memorandum of law ("Resp't Br."), (Docket No.

15).  For the reasons set forth below, I respectfully recommend that the Petition be denied in its

entirety.

## I.  BACKGROUND

### A.  The Crimes and Indictment

      Petitioner's convictions arise out of an incident that occurred on April 30, 2012 in

Clarkstown, New York.  At approximately 4:40 p.m., State Trooper Miguel Berberena

("Berberena") was traveling northbound along Interstate 87 when he observed a gray Chevrolet

Impala ("Impala") traveling "very closely" behind another vehicle. (Docket No. 17 at 777, 779–

---

[1] A *pro se* prisoner's papers are deemed filed at the time he or she delivers them to prison authorities for forwarding
to the court clerk. *Houston v. Lack*, 487 U.S. 266, 276 (1988); *see also Walker v. Jastremski*, 430 F.3d 560 (2d Cir.
2005) (analyzing the *Houston* "prison mailbox rule").  Petitioner certified that his Petition was delivered to the
prison authorities for mailing on February 12, 2018. (Docket No. 2 at 22).  Accordingly, because the timeliness of
the Petition is not challenged, the Court adopts Petitioner's dates for this filing and all other filings discussed herein.

[2] All page number citations to the record refer to the ECF page number unless otherwise noted.

80).  Trooper Berberena stopped the Impala, which was occupied by three individuals driving to Vermont. (*Id.* at 781–82, 784; Docket No. 17-1 at 590).  When he approached the vehicle, Trooper Berberena smelled a strong odor of raw marijuana. (Docket No. 17 at 784).  He asked the driver, Alex Spanos ("Spanos"), and the passengers, Shawna Barrier ("Barrier") and Petitioner, for identification. (*Id.* at 785, 787, 790–92).

Trooper Berberena returned to his patrol car, which is known as an IT-19 or "cage car" because of the partition between the front and rear seats, where he called State Trooper Harold Edwards ("Edwards") for backup. (*Id.* at 764–66, 787–88, 790).  Trooper Edwards arrived approximately five minutes later. (*Id.* at 790).  Trooper Berberena asked Spanos to exit the Impala and he performed a "pat-down" search of Spanos's exterior to ensure that he was not carrying weapons or contraband. (*Id.* at 790, 793–94).  The search did not uncover anything on Spanos's person. (*Id.* 789).  Spanos was placed in the back of Trooper Berberena's patrol car. (*Id.* at 799).

Trooper Edwards then asked Petitioner to exit the vehicle. (*Id.* at 800).  Petitioner "walk[ed] strangely" toward the troopers, "taking little[,] small choppy steps" with his hands raised in the air. (*Id.* at 800–02).  Trooper Berberena performed a pat-down search of Petitioner and noticed an unusual bulge near Petitioner's crotch, which felt like "a little pack of flour" and was not "consistent" with either the human body or a weapon. (*Id.* at 807).  Trooper Berberena asked Petitioner if he had something in his pants. (*Id.* at 810).  At first, Petitioner remarked that he did not know what the Trooper was talking about. (*Id.* at 810–11).  Later, Petitioner insisted the bulge was marijuana. (*Id.* at 836).  Trooper Berberena attempted to handcuff Petitioner and place him in his patrol car. (*Id.* at 818, 815).  Petitioner resisted the handcuffs, forcing Trooper Berberena to "wrestle with [Petitioner's] hands." (*Id.* 812–13).  After he was handcuffed, Petitioner dropped to his knees and "let out a whimper." (*Id.* at  814).  Trooper Berberena

grabbed Petitioner off the ground, carried him to his patrol car, and sat him down next to Spanos. (*Id.* at 815). Spanos was placed in Trooper Edwards' patrol car after the troopers observed Spanos and Petitioner conversing. (*Id.* at 822; Docket No. 17-1 at 217).

Trooper Edwards approached Petitioner to read him his *Miranda* warnings when he saw Petitioner "stomping on a black plastic bag [] with a white powdery substance coming out of it." (Docket No. 17-1 at 218). Shocked, he "dove in the car and held [Petitioner] down" in an attempt to stop him from destroying evidence. (*Id.*). Trooper Berberena ran over and observed a "chunky white substance" strewn across the floor of his patrol car. (Docket No. 17 at 825). He then drew his taser and threatened to "[shoot] the shit out of [Petitioner] if he moved." (*Id.* at 826, 828). Petitioner complied and was placed under arrest. (*Id.* at 828).

Trooper Edwards photographed and collected the substance on the floor of Trooper Berberena's patrol car. (*Id.* at 830). He then searched the Impala, where he found a silver handgun in the center console and a plastic bag containing cocaine in the trunk. (Docket No. 17-1 at 227–33). Spanos and Barrier were placed under arrest and taken to the state police station in Tarrytown, New York ("S.P. Tarrytown"). (*Id.* at 846). Spanos was strip searched when he arrived at the station. (*Id.* at 843). Nothing was found on Spanos's person. (*Id.*).

Petitioner was transported to S.P. Tarrytown where he was also strip searched. (*Id.* at 832, 836–37). The search uncovered a "small amount of marijuana in a plastic bag" that Petitioner had placed in his underwear. (*Id.* at 838). Upon his arrival at S.P. Tarrytown, Petitioner complained of injuries sustained during his arrest. (*Id.* at 861). Petitioner was transported to Phelps Memorial Hospital in Sleepy Hollow, New York where he was triaged and discharged shortly thereafter. (*Id.* at 862). Petitioner was returned to S.P. Tarrytown and interviewed by Investigator Skylar King ("King"). (Docket No. 17-1 at 53). Petitioner told Investigator King that the object Trooper Berberena felt in his pants was marijuana, not cocaine.

(*Id.* at 55–56).  Petitioner further alleged that the plastic bag that he "was seen stomping" on in the back of Trooper Berberena's vehicle also contained marijuana. (*Id.*).

The substance found on the floor of Trooper Berberena's patrol car was weighed by the New York State Bureau of Criminal Investigation Office and confirmed to be approximately 185 grams of cocaine. (*Id.* at 839, 843; Docket No. 17-1 at 241–42).  The Criminal Investigation Office also confirmed that approximately three grams of marijuana was found on Petitioner's person. (Docket No. 17 at 860).  Petitioner was charged with Criminal Possession of a Controlled Substance in the Second and Third Degree and Unlawful Possession of Marijuana.

Spanos was charged with Criminal Possession of a Weapon in the Fourth Degree for the handgun found in his glove compartment. (*Id.* at 124–25).  He was released from the custody of Rockland County Correctional Facility after his father posted bond on his behalf. (*Id.* at 96). Upon his return to Vermont, Spanos was arrested and charged with second degree murder and manslaughter following an incident in which he killed an individual while driving under the influence. (*Id.* at 128–29).

## B.  Pretrial Hearings

On February 6 and 7, 2013, a *Huntley* hearing was held concerning the admissibility of statements Petitioner made to Trooper Berberena and Investigator King. (Docket No. 17 at 1– 102 ).  The People called Trooper Berberena, (*id.* at 7–31, 84–95); Trooper Edwards, (*id.* at 32– 48); and Investigator King, (*id.* at 48–75), to testify at the hearing.  At the close of the prosecution's case, the defense moved to stay the hearing to afford the defense time to contact witnesses to testify on Petitioner's behalf. (*Id.* at 99, 102).  The court denied defense counsel's request. (*Id.* at 102).  On February 11, 2013, the court denied Petitioner's motion to suppress his statements made to law enforcement. (*Id.* at 116).

On February 25, 2021, a *Sandoval* hearing was held regarding the prosecution's latitude in questioning Petitioner about his prior criminal history. (*Id.* at 174–88). The court ruled that if Petitioner testified at trial, the prosecution could impeach Petitioner with questions concerning: (1) his use of aliases, (*id.* at 186); (2) his March 6, 2006 conviction for theft of services, *i.e.*, obtaining public transportation without payment, and the underlying facts, (*id.*); (3) his July 27, 2009 conviction for fourth degree grand larceny with a limited inquiry into the underlying facts and any sentence imposed, (*id.* at 187); (4) his June 12, 2016 second degree attempted robbery charge and the underlying facts, (*id.*); and (5) whether he was convicted of a felony in Vermont on September 8, 2010, but not the underlying charge, (*id.*).

**C. Voir Dire**

Jury selection took place on February 25, 27 and 28, 2013 and March 1 and 4, 2013. At the outset of jury selection, the judge asked the prospective jurors to meet with him and counsel privately if they felt they were unable to serve because of health concerns, vacations or close personal contacts that they had with the criminal justice system. (*Id.* at 162–66).

**1. Andrea Sappleton**

Andrea Sappleton ("Sappleton") requested a private meeting with the court, in which she informed the judge that she wished "to be exempt from th[e] process" because she had a brother who had been "in the system on marijuana charges" and alternatively, she was a single parent and was unable to take off of work. (*Id.* at 228–29). She then asked, "[n]ow are you getting rid of me," and indicated that she "would be biased toward [Petitioner]," stating: "let's be realistic. We have a system that is totally against him. . . . There is a system that is totally against this kid." (*Id.* at 229–30). Defense counsel asked Sappleton if she felt she could render a decision based on the evidence, to which Sappleton replied "I—I—I—I guess." (*Id.* at 230). The defense

did not consent to Sappleton's removal, prompting the judge to ask defense counsel: "Are you serious?" (*Id.* at 231).

Thereafter, the prospective jurors were asked to complete an eleven item questionnaire. (*Id.* at 326). Upon receipt of the questionnaire, Sappleton asked to speak privately with the court. (*Id.* at 328). Sappleton told the court that she found the "entire batch" of "questions to be offensive," specifically, the question asking her age. (*Id.* at 329). Sappleton inquired how her age was going to make her "decision capacities a little bit better or a little bit less." (*Id.*). She also stated that she is "not one of the sheeps [sic]." (*Id.*). The parties returned to the courtroom and questioning resumed.

The prospective jurors were then excused so that the parties could exercise challenges. (*Id.* at 383–85, 387). The prosecution did not challenge Sappleton for-cause, nor did they use a peremptory strike to remove her. (*See id.*). In the middle of peremptory challenges, the court asked to speak with the attorneys off the record. (*Id.* at 389). When the proceedings resumed in open court, the judge announced that the "People [were] going to make an application," at which point the prosecution challenged Sappleton for-cause, on the ground that Sappleton was hostile with the court, refused to answer the questionnaire and expressed bias in favor of the defendant. (*Id.* at 390). The defense objected to Sappleton's removal on timeliness grounds. (*Id.*). The judge stated that "under no circumstances [would Sappleton] serve on th[e] jury . . . You have to be insane to keep her," and noted that he intended to tell the "Commissioner of Jurors that Ms. Sappleton should [not] be called again this year for future jury service because she completely failed to cooperate and participate in jury selection." (*Id.* at 390–92). The court presented Petitioner with the option of continuing *voir dire* or bringing in an entirely new jury pool. (*Id.*). The defense asked for additional time to decide how to proceed. (*Id.* at 393). Court was

adjourned for the day and the jury pool, less Sappleton, was brought back the following morning. (*Id.* at 405).

When court resumed, a lengthy colloquy regarding Sappleton ensued, during which the trial judge explicitly referenced an *ex parte* conversation that took place between himself and the prosecution the previous week. (*Id.* at 405–09). The judge stated that the People did not challenge Sappleton because "[the court] had indicated to [the People] that if [Sappleton] was selected, [the court] would substitute her with an alternate juror." (*Id.* at 408). The court then told defense counsel that "[the prosecution] agreed" to the foregoing arrangement, but "[the court] never consulted with [defense counsel] about that same arrangement." (*Id.*). Ultimately, Petitioner consented to the removal of Sappleton as a juror and decided against bringing in a new panel of jurors. (*Id.* at 412).

## 2. *Batson* Application

On the last day of jury selection, the defense brought a *Batson* motion, challenging the prosecution's use of peremptory strikes. (*Id.* at 530). The defense argued that there were "not many African Americans present" in the venire, which consisted of 55 people, and that the prosecution's use of five peremptory challenges to strike African American jurors raised an inference of discrimination. (*Id.* at 531). The prosecution responded that there were two African American women seated as jurors and that the defense eliminated an African American juror, Jean Rene, who the prosecution sought to keep. (*Id.* at 534). The court asked the defense to elaborate on the alleged *Batson* violation. (*Id.* at 536). The defense explained that the prosecution used peremptory strikes on the following jurors: Jaccim Jean Francios ("Francois"), Guylene Joseph ("Joseph"), Dona Norceide ("Norceide"), Stacey E. Richards ("Richards") and Stephen Plummer ("Plummer"), all of whom were African American. (*Id.*). The judge responded that the defense "ha[d] to do better than that," and noted that he was "beginning to

believe that [Petitioner] believes that no African American should be challenged." (*Id.* at 534, 537). The court denied Petitioner's *Batson* application as untimely, stating that the challenged jurors had already been dismissed. (*Id.* at 537).

## D. Trial and Verdict

The Honorable William K. Nelson presided over the trial, which was held on March 4, 6, 7, 11, 13–15, 18–22, 25 and 26, 2013. (Docket Nos. 17, 17-1). The trial commenced on March 4, 2013 with opening statements. (*Id.* at 729–59). In support of its case-in-chief, the People called: (1) Trooper Berberena (*id.* at 760–877; Docket No. 17-1 at 50–188); (2) Rachael Stubbs, (Docket No. 17-1 at 2–49); (3) Trooper Edwards, (*id.* at 189–290); and (4) Investigator King, (*id.* at 300–16). Additionally, the parties stipulated to the testimony of Investigator King, Investigator Laruffa and Detective Mulkeen concerning the state police department's maintenance of a proper chain of custody with respect to the cocaine and marijuana recovered subsequent to the traffic stop. (*Id.* at 296–300). The People rested on March 11, 2013. (Docket No. 17-1 at 318). Petitioner's trial counsel moved to dismiss the indictment, arguing that the People failed to establish a *prima facie* case. (*Id.*). The court reserved decision on the defense's motion. (*Id.* at 319).

The defense rested on March 14, 2013 and renewed its application to dismiss the indictment for the prosecution's failure to prove its *prima facie* case beyond a reasonable doubt. (*Id.* at 347). The court again reserved decision on the motion, which was never resolved. (*See id.* at 348). Both sides delivered summations on March 14, 2013. (*Id.* at 354–421).

The jury was charged on March 14, 2013, (*id.* at 421–50) and deliberated for seven days before returning a verdict finding Petitioner guilty of Criminal Possession of a Controlled Substance in the Second Degree and Unlawful Possession of Marijuana, (*id.* at 573). Petitioner was found not guilty of Criminal Possession of a Controlled Substance in the Third Degree. (*Id.*).

On September 17, 2013, the trial court sentenced Petitioner to a determinate sentence of fifteen years' imprisonment followed by five years' post-release supervision for criminal possession of a controlled substance. (*Id.* at 593). Petitioner was fined $100.00 for unlawfully possessing marijuana. (*Id.*).

## E. Direct Appeal

Petitioner filed a direct appeal on October 28, 2015 to the New York State Appellate Division for the Second Department ("Appellate Division") raising the following five grounds for relief: (1) the improper exclusion of Sappleton from the jury denied Petitioner his right to a particular jury chosen according to the law, (Docket No. 16 at 32–50); (2) the trial court's *ex parte* conference with the prosecution regarding Sappleton violated Petitioner's Sixth Amendment rights to be present at each stage of trial and to have the assistance of counsel at each stage of trial, (*id.* at 50–54); (3) the court's denial of Petitioner's *Batson* application was clear error and violated the Fourteenth Amendment, (*id.* at 55–60); (4) Petitioner's Sixth Amendment right to compulsory process was denied by the trial court's refusal to compel Spanos's attendance at trial, (*id.* at 61–68); and (5) Petitioner's sentence was harsh and excessive, (*id.* at 69–75). The People filed an opposition to Petitioner's appeal, (*id.* at 78–116), which was served on Petitioner on April 15, 2016,[3] (*id.* at 117). Petitioner submitted a *pro se* reply, (*id.* at 118–28), which was served on the People on June 15, 2016,[4] (*id.* at 129), in which he raised a sixth ground for relief, arguing that the trial court improperly failed to answer one of the jury's notes during deliberations, (*id.* at 124–28).

On January 11, 2017, the Appellate Division affirmed Petitioner's convictions but found that his sentence was excessive. *People v. Khan*, 146 A.D.3d 810 (2d Dep't 2017). The

---

[3] The People's brief in opposition to Petitioner's appeal is not dated. (*See* Docket No. 16 at 78–116).

[4] Petitioner's *pro se* reply is not dated. (*See* Docket No. 16 at 118–27).

Appellate Division reduced Petitioner's sentence to a determinate term of ten years' imprisonment followed by five years' post-release supervision. *Id.* at 810. Petitioner sought leave to appeal to the New York State Court of Appeals ("Court of Appeals") on February 22, 2017, raising four grounds for relief: (1) the Appellate Division erred in finding that the trial court's exclusion of Sappleton was proper; (2) the Appellate Division erred in holding that Petitioner failed to establish a *prima facie Batson* case; (3) Petitioner was denied his right to compulsory process; and (4) the trial court's *ex parte* conference with the prosecution prejudiced Petitioner's trial. (Docket No. 16 at 145–46). The People responded on April 3, 2017, (*id.* at 147), and the Court of Appeals issued a certificate denying leave on May 2, 2017, (*id.* at 148).

**F. Federal Habeas Corpus Proceedings**

Petitioner filed the instant Petition on February 12, 2018. (Petition at 22). Respondent opposed the Petition on July 10, 2018, (Docket No. 14), accompanied by a supporting memorandum of law, ("Resp't Br.").

**II. APPLICABLE LAW**

"The statutory authority of federal courts to issue habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996" ("AEDPA"). *Harrington v. Richter*, 562 U.S. 86, 97 (2011). "Before a federal district court may review the merits of a state criminal judgment in a habeas corpus action, the court must first determine whether the petitioner has complied with the procedural requirements set forth in 28 U.S.C. §§ 2244 and 2254." *Visich v. Walsh*, No. 10 Civ. 4160 (ER)(PED), 2013 WL 3388953, at *9 (S.D.N.Y. July 3, 2013).[5] The procedural and substantive standards are summarized below.

---

[5] If Petitioner does not have access to cases cited herein that are available only by electronic database, then he may request copies from Respondent's counsel. *See* Local Civ. R. 7.2 ("Upon request, counsel shall provide the pro se

## A.  Exhaustion as a Procedural Bar

A habeas petition may not be granted unless the petitioner has exhausted his claims in

state court. *See* 28 U.S.C. § 2254(b).  As the statute prescribes:

> (b)(1) An application for a writ of habeas corpus on behalf of a person in custody
> pursuant to the judgment of a State court shall not be granted unless it appears that–
>
>> (A) the applicant has exhausted the remedies available in the courts of the
>> State; or
>>
>> (B)(i) there is an absence of available State corrective process; or
>>
>> (ii) circumstances exist that render such process ineffective to protect the
>> rights of the applicant.
>>
>> . . .
>
> (c) An applicant shall not be deemed to have exhausted the remedies available in
> the courts of the State, within the meaning of this section, if he has the right under
> the law of the State to raise, by any available procedure, the question presented.

28 U.S.C. § 2254(b)–(c).

Exhaustion requires a prisoner to have "fairly presented to an appropriate state court the

same federal constitutional claim that he now urges upon the federal courts." *Turner v. Artuz*,

262 F.3d 118, 123 (2d Cir. 2001) (internal quotations omitted).  If a petitioner "cites to specific

provisions of the U.S. Constitution in his state court brief, the petitioner has fairly presented his

constitutional claim to the state court." *Davis v. Strack*, 270 F.3d 111, 122 (2d Cir. 2001); *see*

*also Reid v. Senkowski*, 961 F.2d 374, 376 (2d Cir. 1992) (even "a minimal reference to the

Fourteenth Amendment" presents a federal constitutional claim to the state courts).  A petitioner

may fairly present his claim even without citing to the U.S. Constitution, by, *inter alia*: "(a)

[relying] on pertinent federal cases employing constitutional analysis, (b) [relying] on state cases

---

litigant with copies of such unpublished cases and other authorities as are cited in a decision of the Court and were
not previously cited by any party.").

employing constitutional analysis in like fact situations, (c) [asserting] . . . [a] claim in terms so particular as to call to mind a specific right protected by the Constitution, and (d) [alleging] . . . a pattern of facts that is well within the mainstream of constitutional litigation." *Daye v. Attorney Gen. of State of N.Y.*, 696 F.2d 186, 194 (2d Cir. 1982). Fair presentation includes petitioning for discretionary review in the state's highest appellate court. *See O'Sullivan v. Boerckel*, 526 U.S. 838, 839–40 (1999) ("[A] state prisoner must present his claims to a state supreme court in a petition for discretionary review in order to satisfy the exhaustion requirement[.]").

**B. Adequate and Independent State Grounds as a Procedural Bar**

"It is well established that federal courts will not review questions of federal law presented in a habeas petition when the state court's decision rests upon a state-law ground that 'is independent of the federal question and adequate to support the judgment.'" *Cone v. Bell*, 556 U.S. 449, 465 (2009) (quoting *Coleman v. Thompson*, 501 U.S. 722, 729 (1991)). This preclusion applies even if the state court alternatively rules on the merits of the federal claim, so long as there is an adequate and independent state ground that would bar the claim in state court. *See, e.g.*, *Harris v. Reed*, 489 U.S. 255, 264 n.10 (1989); *accord Garcia v. Lewis*, 188 F.3d 71, 77 (2d Cir. 1999). "A state court decision will be 'independent' when it 'fairly appears' to rest primarily on state law." *Taylor v. Connelly*, 18 F. Supp. 3d 242, 253 (E.D.N.Y. 2014) (quoting *Jimenez v. Walker*, 458 F.3d 130, 138 (2d Cir. 2006)). Typically, a ground is adequate "only if it is based on a rule that is 'firmly established and regularly followed' by the state in question." *Garcia*, 188 F.3d at 77 (quoting *Ford v. Georgia*, 498 U.S. 411, 423-24 (1991)); *see also Cotto v. Herbert*, 331 F.3d 217, 239 (2d Cir. 2003).

**C. AEDPA Standard of Review**

When a federal court reaches the merits of a habeas petition, AEDPA prescribes a "highly deferential" standard for reviewing state court rulings. *Lindh v. Murphy*, 521 U.S. 320,

333 n.7 (1997); *see also Fischer v. Smith*, 780 F.3d 556, 561 (2d Cir. 2015). An application for a writ of habeas corpus:

> shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)–(2).

Courts have interpreted the phrase "adjudicated on the merits" in AEDPA as meaning that a state court "(1) dispose[d] of the claim on the merits, and (2) reduce[d] its disposition to judgment." *Sellan v. Kuhlman*, 261 F.3d 303, 312 (2d Cir. 2001) (internal quotation marks omitted). Courts examine the "last reasoned decision" by the state courts in determining whether a federal claim was adjudicated on the merits. *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991) ("Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground.").

If a state court adjudicates a federal claim on the merits, the Court must apply AEDPA deference to that state court ruling.[6] 28 U.S.C. § 2254(d)(1)–(2). In the context of AEDPA deference, the phrase "clearly established Federal law" means "the holdings, as opposed to the dicta, of [the Supreme Court of the United States'] decisions as of the time of the relevant state–court decision." *Williams v. Taylor*, 529 U.S. 362, 365 (2000). "A state court decision is contrary to such clearly established federal law if it 'applies a rule that contradicts the governing

---

[6] If, by contrast, a state court does not adjudicate a federal claim on the merits, "AEDPA deference is not required. . . . [and] conclusions of law and mixed findings of fact and conclusions of law are reviewed de novo." *DeBerry v. Portuondo*, 403 F.3d 57, 66-67 (2d Cir. 2005).

law set forth in the Supreme Court's cases' or 'if the state court confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a result different from its precedent.'" *Lewis v. Conn. Comm'r of Corr.*, 790 F.3d 109, 121 (2d Cir. 2015) (quoting *Boyette v. Lefevre*, 246 F.3d 76, 90 (2d Cir. 2001)). A state court decision involves an "unreasonable application" of Supreme Court precedent if: (1) "the state court identifies the correct governing legal rule from [Supreme Court] cases but unreasonably applies it to the facts of the particular state prisoner's case," or (2) "the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Williams*, 529 U.S. at 407. For a federal court to find a state court's application of Supreme Court precedent unreasonable, the state court's decision must have been more than "incorrect or erroneous" — it must have been "objectively unreasonable." *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003). In other words, "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of [the state court's] decision." *Richter*, 562 U.S. at 101 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 665 (2004)). However, "the trial court's decision need not teeter on 'judicial incompetence' to warrant relief under § 2254(d)." *Alvarez v. Ercole*, 763 F.3d 223, 229 (2d Cir. 2014) (quoting *Francis S. v. Stone*, 221 F.3d 100, 111 (2d Cir. 2000)). If a state court decision does not contain reasons for the dismissal of a defendant's federal claim, the Court must "consider 'what arguments or theories . . . could have supported[] the state court's decision,' and may grant habeas only if 'fairminded jurists could [not] disagree that those arguments or theories are inconsistent with the holding in a prior decision of' the Supreme Court." *Lynch v. Superintendent Dolce*, 789 F.3d 303, 311 (2d Cir. 2015) (alterations in original) (quoting *Richter*, 562 U.S. at 102).

## III. DISCUSSION

The Petition advances the following four grounds for relief: (1) the trial court's exclusion of Sappleton from the jury violated the Sixth Amendment, (Petition at 10); (2) the trial court's improper *ex parte* conference with the prosecution violated the Sixth Amendment, (*id.* at 10–11); (3) the denial of Petitioner's *Batson* challenge violated the Fourteenth Amendment, (*id.* at 11); and (4) the trial court's denial of Petitioner's motion to compel Spanos's attendance at trial pursuant to N.Y. C.P.L. § 650.20 or alternatively, N.Y. C.P.L. § 680, violated the Sixth Amendment, (*id.* at 12).

### A. Trial Court's Grant of Prosecution's Untimely For-Cause Challenge to Sappleton

Petitioner argues that the trial court's grant of the prosecution's untimely for-cause challenge to Sappleton violated his right to a "particular jury chosen according to law." (Petition at 10). Respondent avers that Petitioner's claim does not present a federal question that is cognizable on habeas review. (Resp't Br. at 17, 19–20). Respondent alternatively argues that Petitioner did not establish that Sappleton's dismissal prejudiced his trial. (*Id.* at 20). Petitioner exhausted his claim concerning Sappleton's dismissal before the state courts. (Docket No. 16 at 32–51). The Appellate Division denied Petitioner's claim on the merits, concluding that the trial judge did not err in excusing Sappleton "in effect, for cause on the ground that [Sappleton's] statements indicated" that her state of mind precluded her from rendering an impartial verdict. *See Khan*, 146 A.D.3d at 810–11 (quoting N.Y. C.P.L. § 270.20(1)(b)). The Court affords AEDPA deference to the state court's ruling on the merits. *See* 28 U.S.C. § 2254(d).

Petitioner's claim that he was denied the right to a "particular jury chosen according to law," raises an issue of state-law, which is not cognizable on habeas review. *See People v. Ivery*, 465 N.Y.S.2d 371, 372 (4th Dep't 1983) ("defendant has a constitutional right to a particular jury chosen according to law") (citing N.Y. CONST. art. I, § 2); *Estelle v. McGuire*, 502 U.S. 62, 68

(1991) ("it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."). Generally, "[j]uror discharge and *voir dire* proceedings are governed by state law." *McCrary v. Artuz*, No. CV 95–622 (RJD), 1995 WL 728423, at * 4 (E.D.N.Y. Nov. 28, 1995) (citing N.Y. C.P.L. §§ 270.35, 270.15(3)). Furthermore, "a violation of a state statute such as New York's rule governing juror discharge is not a claim cognizable on federal habeas review unless the violation implicates federal constitutional concerns." *Johnson v. Artuz*, No. 00-CV-6106T, 2006 WL 1144513, at *6 (W.D.N.Y. May 1, 2006); *see, e.g.*, *Baston v. Artus*, No. 08 CV 3425(RJD), 2010 WL 5067696, at *2 (E.D.N.Y. Dec. 6, 2010) (petitioner's claim that the trial judge erred in dismissing a juror after the start of deliberations without petitioner's written consent is not a basis for federal habeas relief).

Petitioner's claim does not implicate federal constitutional concerns. Federal law vests trial judges with broad discretion to "intervene to ensure that the jury" makes its ultimate determination fairly, which is "cabined only by the requirement that there be no prejudice to the defendant through a biased jury." *Rosado v. Unger*, No. 11 Civ. 3747(KBF)(THK), 2012 WL 5871607, at *11 (S.D.N.Y. May 4, 2012). As such, "[t]he only claim appropriate for [habeas] review is that the jury actually chosen was biased." *Mackensy v. Miller*, No. 00 Civ. 9296(DAB), 2010 WL 101321, at *5 (S.D.N.Y. Jan. 12, 2010). Therefore, Petitioner must establish that "the jury that convicted him was [not] fair and impartial." *See United States v. Perez*, 387 F.3d 201, 207 (2d Cir. 2004). The Petition is devoid of allegations that the jury impaneled at Petitioner's trial was biased, or that Sappleton's dismissal tainted the selected jurors. Indeed, the record is clear that Sappleton was dismissed, effectively for cause, because she expressed bias in favor of Petitioner and refused to cooperate in *voir dire*. Although Petitioner likely wanted to keep Sappleton on the jury because of her stated bias in his favor, the fact that she was dismissed for such a bias had no impact on the impartiality of the jury actually impaneled. Accordingly, even

assuming, *arguendo,* that the trial court erred in dismissing Sappleton, that error does not implicate the federal constitution where, as here, there are no allegations that the jury that convicted Petitioner was prejudiced against him. *See, e.g.*, *Rivalta v. Artuz*, No. 96 CIV. 8043(SAS), 1997 WL 401819, at *6 (S.D.N.Y. July 16, 1997) (trial court's improper substitution of a juror does not rise to the level of a federal constitutional violation where petitioner does not establish that he was prejudiced by the impaneled jury) (citing *United States v. Hillard*, 701 F.2d 1052, 1058 (2d Cir. 1983)). Thus, the Court respectfully recommends that Petitioner's claim regarding Sappleton's removal from the jury be denied.

## B. *Ex Parte* **Conference**

Petitioner argues that the trial court's *ex parte* conference with the prosecution concerning Sappleton violated his Sixth Amendment right to counsel and to be present throughout trial. (Petition at 10–11).[7] Petitioner properly exhausted this claim before the state courts, which the Appellate Division rejected on the merits. *See Khan*, 146 A.D.3d at 810–11. Respondent avers that the Appellate Division's ruling did not constitute an unreasonable application of Supreme Court law. (Resp't Br. at 18–19).

The Due Process Clause of the Fourteenth Amendment and the Confrontation Clause of the Sixth Amendment "both guarantee to a criminal defendant . . . the 'right to be present at all stages of the trial where his absence might frustrate the fairness of the proceedings.'" *Tennessee v. Lane*, 541 U.S. 509, 523 (2004) (quoting *Faretta v. California*, 422 U.S. 806, 819 n.15

---

[7] The Court construes the Petition as alleging a violation of Petitioner's right to be present at all material stages of trial. *See, e.g.*, *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996) (*pro se* filings should be construed liberally and interpreted to raise the strongest arguments that they suggest). Case law concerning constitutional violations arising from an improper *ex parte* communication between the court and prosecution typically analyze whether the claimant was deprived of his right to be present. *See, e.g.*, *Marji v. Rock*, No. 09 Civ. 2420 (CS), 2011 WL 4888832, at *12–13 (S.D.N.Y. July 19, 2011) (analyzing whether an *ex parte* phone call between prosecutor and judge's law clerk violated petitioner's "right to be present") *report and recommendation adopted by* 2011 WL 4888829 (S.D.N.Y. October 13, 2011); *Ochoa v. Breslin*, 798 F. Supp. 2d 495, 504 (S.D.N.Y. July 13, 2011) (discussing whether *ex parte* conversation between court and juror violated petitioner's right to be present).

(1975)).  The Supreme Court has recognized that this right is not absolute and "is triggered only when the defendant's 'presence has a relation, reasonably substantial, to the fulness of his opportunity to defend against the charge.'" *Cohen v. Senkowski*, 290 F.3d 485, 489 (2d Cir. 2002) (quoting *Snyder v. Massachusetts*, 291 U.S. 97, 105–06, 106–07 (1934) (overruled on other grounds) (defendant has no right to be present where his "presence would be useless, or the benefit but a shadow.")).  Thus, a criminal defendant does not have the right to be present for a proceeding that "involves only questions of law or procedure, because in such proceedings, the defendant has no peculiar factual knowledge that would allow him to make a material contribution." *Salley v. Graham*, No. 07 Civ. 455(GEL), 2008 WL 818691, at *4 (S.D.N.Y. Mar. 27, 2008) (internal quotations and citations omitted).  This right is additionally circumscribed by harmless error analysis. *See, e.g.*, *Rushen v. Spain*, 464 U.S. 114, 117 (1983).[8]

It is well-settled that the impaneling of the jury is a material stage of trial where the defendant has the right to be present. *See Gomez v. United States*, 490 U.S. 858, 873 (1989); Fed. R. Crim. P. 43(a).  Therefore, the question before the Court is whether Petitioner's presence at the *ex parte* conference would have furthered his ability to defend the charges against him. *See Patterson v. California*, No. 2:12–cv–2475–KJM–EFB P, 2014 WL 840281, at *13 (E.D. Cal. Mar. 4, 2014) (*ex parte* conversation between judge and prosecutor concerning defendant's motion to quash subpoena did not warrant habeas relief where defendant was given subsequent opportunity "to make any arguments he could have made . . . during the earlier *ex parte* discussion."); *Arceneaux v. United States*, No. 05-0989, 2009 WL 3584351, at *5 (W.D. La. Oct. 28, 2009) (defendant's constitutional rights were not violated where an *ex parte* conference

---

[8] The Second Circuit interprets *Rushen* as leaving open the possibility that "in very egregious circumstances," for instance, where the defendant was excluded from the entire trial, a presence violation may be considered a structural error that is not subject to harmless error review. *Yarborough v. Keane*, 101 F.3d 894, 897–98 (2d Cir. 1996).  Such circumstances are not present here. *See id.*

between the judge and prosecutor "served to *benefit*" the defendant) (emphasis in original). The Appellate Division did not address this issue. Furthermore, there is no record of the *ex parte* conference, however, the record is clear that the defense was later appraised of the substance of the conversation, in which the court indicated to the prosecution that if Sappleton was selected to serve on the jury, the court would "substitute her with an alternate juror." (Docket No. 17 at 408).

Although the *ex parte* conference was improper, it is clear upon review of the record that the conference did not detract from Petitioner's ability to defend the charges against him for two reasons. First, the subject of the conference — Sappleton's eligibility to serve — is a legal issue to which Petitioner could not have meaningfully contributed. *Cf. Figueroa v. Donnelly*, No. 02 Civ. 6259(NRB), 2003 WL 21146651, at *9 (S.D.N.Y. May 16, 2003) (defendant had no right to be present at a side-bar conference where the court, counsel and a prospective juror discussed whether the juror should be dismissed for-cause, because defendant could not have meaningfully contributed to the side-bar discussion).

Second, Petitioner does not explain how his presence at the conference would have influenced the court's previously reached determination that Sappleton was an ineligible juror, (*see, e.g.*, Docket No. 17 at 391–92, 394), or otherwise benefitted his defense. Indeed, had Petitioner attended the conference, there was nothing he could have done to keep Sappleton on the jury. The record indicates that Sappleton expressed a clear bias in favor of the defendant and refused to meaningfully cooperate in the *voir dire* proceedings. (*See, e.g.*, *id.* at 230, 329–30). For instance, when asked if she could be impartial, Sappleton stated that she "would be biased toward [Petitioner]" and, when asked again, responded: "Let's be realistic. We have a system that is totally against him. . . . There is a system against this kid." (*Id.* at 230). It is also obvious that the trial court concluded, before the improper *ex parte* conference, that Sappleton's bias

rendered her ineligible to serve on the jury and planned to exclude her *sua sponte* if she was not struck by the prosecution. (*See, e.g.*, *id.* at 231, 391–92, 394, 408). The court made a record that "under no circumstances [would Sappleton] serve on this jury . . . You have to be insane to keep her on this jury the way she responded to the questions posed to her." (*Id.* at 394). The court further stated that Sappleton was an "inappropriate juror" because "she expressed a bias in favor of [Petitioner]" and in such circumstances, the court would "have the right and the obligation to dismiss her." (*Id.* at 408). Furthermore, when the court relayed the substance of the *ex parte* conference to defense counsel, defense counsel was given the opportunity to object to Sappleton's removal which was followed by a lengthy discussion. (*Id.* at 404). Despite defense counsel's objections, the court concluded that "[Sappleton] is not a [sic] appropriate juror and . . . the record substantiates that one hundred percent." (*Id.* at 405–09). Accordingly, Petitioner has not demonstrated that his presence at the conference could have impacted the trial court's ruling regarding Sappleton. Thus, Petitioner has not shown that his attendance at the conference would have had a "relation to the fulness of his opportunity to defend against the charges," such that his right to be present was violated. *See Snyder*, 291 U.S. at 105–06.

Alternatively, Petitioner was not prejudiced by the *ex parte* conference. The court relayed the substance of the *ex parte* conference to the defense in open court and crucially, did not rule on Sappleton's dismissal until it heard defense counsel's objections. (*See* Docket No. 17 at 408); *Williams v. Keane*, No. 93 CV 3653 (SJ), 1995 WL 745006, at *3 (E.D.N.Y. Nov. 29, 1995) (*ex parte* communication concerning admissibility of evidence between prosecutor and judge, which was "concededly an error of the trial court," did not prejudice petitioner's trial where the court did not make an admissibility ruling until it heard the defense's arguments). Furthermore, as discussed *supra*, the record is clear that Sappleton expressed bias in favor of Petitioner and was non-cooperative with jury selection, and that the court intended to remove

Sappleton either subsequent to a for-cause challenge or *sua sponte*. Thus, the improper conference did not impact the court's decision concerning Sappleton's eligibility to serve. Finally, the court attempted to cure any prejudice to Petitioner by offering him the option of restarting jury selection with a new panel of jurors. After time to discuss this offer with his attorney, Petitioner chose to proceed with the original venire. In sum, Petitioner was not prejudiced by the improper *ex parte* conference. For these reasons, the Court respectfully recommends dismissal of Petitioner's claim concerning the trial court's *ex parte* conference.

## C. *Batson* Motion

Petitioner asserts that the trial judge erred in denying his *Batson* challenge in violation of the Fourteenth Amendment. (Petition at 11). Petitioner contends that he was denied the opportunity to make a *prima facie* showing that the prosecution's use of peremptory challenges was based on the prospective jurors' race, since the trial court denied his motion as untimely. (*Id.*). Petitioner properly exhausted this claim on direct appeal, which was denied by the Appellate Division. *See Khan*, 146 A.D.3d at 811. The Appellate Division found that although the trial court's ruling concerning the timeliness of Petitioner's *Batson* motion was in error, Petitioner "failed to meet his prima facie burden of setting forth facts supporting an inference of discrimination." *Id.* Respondent contends that the Appellate Division's ruling was not an unreasonable application of Supreme Court precedent. (Resp't Br. at 21–24).

A defendant is denied equal protection of the laws where he is tried "before a jury from which members of his race have been purposefully excluded." *Batson v. Kentucky*, 476 U.S. 79, 85 (1986). *Batson* sets forth a three-step burden shifting framework for evaluating whether a prosecutor's use of peremptory challenges violates the Fourteenth Amendment. *See Hernandez v. New York*, 500 U.S. 352, 358–59 (1991). First, the defense must make a *prima facie* showing that a peremptory challenge was exercised on account of a juror's race. *See id.* at 358. Second, if

the defense makes a *prima facie* showing of a race-based peremptory strike, the onus shifts to the prosecutor to state a race-neutral reason for the strike. *See id.* at 358–59. Third, if the prosecutor provides a race-neutral reason for the strike, defendant bears the ultimate burden of showing that the proffered reason was pre-textual and that the strike was motivated by purposeful discrimination. *See id.* at 359.

To establish a *prima facie* case of discrimination, the defendant must show "facts and any other relevant circumstances" that raise an inference that the prosecutor used peremptory challenges "to exclude the veniremen from the petit jury on account of their race." *Batson*, 476 U.S. at 96. "The first step of the *Batson* inquiry is not an 'onerous' one and 'a prima facie case of discrimination can be made out by offering a wide variety of evidence.'" *Guardino v. Sabourin*, No. 11 Civ. 6906, 2012 WL 6013022, at *13 (S.D.N.Y. Dec. 3, 2012) (quoting *Brown v. Alexander*, 543 F.3d 94, 101 (2d Cir. 2008)). Among the relevant circumstances courts consider are the number of "members of the cognizable racial group . . . in the venire panel from which the petit jury is chosen, the pattern of strikes against racial group jurors in the particular venire, [and] the prosecutor's statements and questions during selection, as well as any other relevant circumstances." *Tankleff v. Senkowski*, 135 F.3d 235, 249 (2d Cir. 1998). Furthermore, "a defendant may establish a prima facie case of purposeful discrimination" based "solely on evidence concerning the prosecutor's exercise of peremptory challenges." *Batson*, 476 U.S. at 96; *accord Messiah v. Duncan*, 435 F.3d 186, 194 (2d Cir. 2006) ("An oft-used method for [establishing a *prima facie* case] is the description or discernment of a 'pattern' of strikes against panelists who are members of particular protected groups.").

Respondent argues that Petitioner failed to make the requisite *prima facie* showing because "he did not articulate how many African American jurors were in the venire." (Resp't Br. at 23). Respondent continues that "[t]he record does not reflect the number of African

American jurors that had been subjected to peremptory strikes or how many were remaining in the venire" and that without that information, petitioner failed to establish that the prosecutor's strike pattern suggested a discriminatory motive. (*Id.*).

In *Sorto v. Herbert*, the Second Circuit instructed that where a petitioner's *prima facie Batson* showing is premised on a pattern of peremptory strikes, the petitioner is not entitled to habeas relief unless he can "adduce a record of baseline factual circumstances attending the *Batson* challenge." 497 F.3d 163, 171 (2d Cir. 2007). Such a record would "likely include evidence such as the composition of the venire, the adversary's use of peremptory challenges, the race of the potential jurors stricken, and a clear indication as to which strikes were challenged when and on what ground, and which strikes were cited to the trial court as evidence of discriminatory intent." *Id.* at 171–72. This approach is "driven by information regarding the prosecution's strikes" and allows "the federal court [to] usefully consider a prosecutorial strike pattern in the essential contexts." *Id.* at 172.

The instant record does not contain sufficient data regarding the prosecution's peremptory strikes to support a finding that the Appellate Division unreasonably applied *Batson*. *See, e.g.*, *id.* at 172–73. The record indicates that the People exercised a total of 13 peremptory strikes,[9] (Docket No. 17 at 386, 388, 414, 524–26), five of which eliminated African American jurors, namely: Francois, Joseph, Richards, Norceide and Plummer, (*id.* at 535). The record is devoid of information regarding the races of the other 8 jurors removed by the prosecution or the racial composition of the jury pool as a whole.

---

[9] The record indicates that the prosecution had eliminated the following jurors using peremptory challenges at the time of Petitioner's *Batson* challenge: (1) Jorge Silvia, (Docket No. 17 at 386); (2) Sam Turner, (*id.*); (3) Edward Urena, (*id.*); (4) Omar Leonard, (*id.*); (5) Sankaranaray Unnikrishan, (*id.* at 388); (6) Mark Odenbach, (*id.*); (7) Francois, (*id.*); (8) Joseph, (*id.* at 414); (9) Richards, (*id.* at 524–25); (10) Norceide, (*id.* at 524); (11) Daniel Petrow, (*id.* at 526); (12) Andrew Pecorino, (*id.*); and (13) Plummer, (*id.*).

The record also lacks any indication that the prosecution's elimination of any of the five African American jurors was because of the jurors' race. In making its motion, the defense raised the general contention that the fact that five African American jurors were eliminated by the prosecution, and "that there were not that many African Americans present" in the jury pool, tends to show a pattern of discrimination. (*Id.* at 535). This argument is not supported by the record. In fact, the record demonstrates that two potential jurors, Plummer and Francois, were likely removed for reasons unrelated to race. (*See id.* at 354, 481, 522–23). The People initially moved to strike Plummer for cause because he "freely admitted that that he . . . [has] a financial interest in the legalization of marijuana." (*Id.* at 522–23). After the judge denied the People's motion, the prosecution used a peremptory challenge to remove Plummer. (*Id.* at 526). Further, the record tends to show that Francois was struck because he stated he could not be impartial. (*Id.* at 354). Francois indicated that he watched a lot of television. (*Id.* at 328). When the prosecution asked Francois if he believed he could "determine th[e] case solely on . . . the evidence" and not let "any television show . . . affect [his] ability to be a fair and impartial juror," Francois responded "No." (*Id.* at 354). The record does not shed light on the prosecution's reason for removing Joseph, Richards or Norceide.

In sum, the trial record, which does not include information concerning the racial composition of the venire and does not indicate that the challenged strikes were on account of race, does not provide a sufficient basis to conclude that the Appellate Division unreasonably applied *Batson*. *See Guardino*, 2012 WL 6013022, at *14 (finding that the record did not include sufficient data as to the prosecution's strike pattern to conclude that *Batson* was unreasonably applied where "[t]he defense made no record of the racial . . . composition of the remaining venire nor did they articulate other facts and circumstances that, in their view, gave rise to an inference of discrimination.") (quoting *People v. Hecker*, 917 N.Y.S.2d 29, 56 (2010)); *accord*

*Sorto*, 497 F.3d 163, 173.  Accordingly, the Court respectfully recommends denial of Petitioner's *Batson* claim.

## D.  Compulsory Process

Petitioner argues that his Sixth Amendment right to compulsory process was violated by the trial court's denial of his motion to compel Spanos's attendance at trial. (Petition at 12). Respondent avers that Petitioner was not entitled to compel Spanos's attendance because he failed to show that Spanos's testimony would have been favorable. (Resp't Br. at 25).  Further, Respondent argues that Petitioner's right to call Spanos at trial was nullified by Spanos's counsel's indication that Spanos would invoke his Fifth Amendment privilege if called to testify. (*Id.*).  Petitioner properly exhausted this claim on direct appeal, which was denied by the Appellate Division on the merits. *See Khan*, 146 A.D.3d at 811.

The Sixth Amendment's Compulsory Process Clause guarantees a criminal defendant the right to obtain the attendance of witnesses favorable to their defense. *See Taylor v. Illinois*, 484 U.S. 400, 409 (1988).  The power to compel testimony is not absolute. *See Kastigar v. United States*, 406 U.S. 441, 444 (1972).  Indeed, the Sixth Amendment, by its terms, limits the defendant's right to "compulsory process for obtaining *witnesses in his favor.*" *Id.* (quoting U.S. Const. amend. VI (emphasis added)).  Accordingly, a defendant who seeks to compel the attendance and testimony of a witness must "make some plausible showing of how their testimony would have been both material and favorable to his defense." *United States v. Valenzuela-Bernal*, 458 U.S. 858, 867 (1982); *accord United States v. Scopo*, 861 F.2d 339, 345 (2d Cir. 1988).  Furthermore, a defendant's right to compel testimony in his favor may be limited by a witness's proper invocation of their Fifth Amendment privilege against self-incrimination. *See Kastigar*, 406 U.S. at 444; *United States v. Bowe*, 698 F.2d 560, 565 (2d Cir. 1983) (where the defendant's right to compulsory process and a witness' Fifth Amendment right are

"irreconcilable," a defendant's "right to call a witness may be effectively nullified by the witness' refusal to answer questions on fifth amendment grounds.").

At the time of Petitioner's trial, Spanos was incarcerated in Rutland County Jail in Vermont awaiting trial for manslaughter, murder and possibly vehicular homicide charges. (Docket No. 17 at 122–23).  In connection with the incident that took place on April 30, 2012, Spanos had an open charge pending against him in Rockland County for criminal possession of a weapon. (*Id.* at 124).  During the pre-trial hearing, the defense moved to compel Spanos's attendance pursuant to N.Y. C.P.L. § 650.20, arguing that Spanos may be able to provide favorable testimony, as he was placed in Trooper Berberena's patrol car before Petitioner and may have observed a back bag in the car at the time that he was detained. (*Id.* at 122, 126, 133).  The prosecution contended that the People would be prejudiced if Spanos took the stand only to invoke his Fifth Amendment protection against self-incrimination. (*Id.* at 125–26).

The court asked Spanos's attorney, Clare McCue Cincotta ("Cincotta"), whether Spanos would invoke the Fifth Amendment if he was subpoenaed. (*Id.* at 127).  Cincotta explained that she had not had direct contact with Spanos, who had been continuously incarcerated in Vermont. (*Id.* at 130).  Cincotta stated that she could not competently advise her client until she knew the charges that the People planned to bring against Spanos if he returned to the forum. (*Id.* at 132).  The prosecutor responded that whether the charges pending against Spanos would be upgraded depended on Spanos's testimony, but that the District Attorney's office would bring a perjury charge if Spanos testified that the cocaine was his, as Spanos gave a written statement denying knowledge of the cocaine. (*Id.* at 135).  Noting the seriousness of the charges against Spanos pending in Vermont, the defense alternatively argued that Spanos could complete interrogatories for the court to review *in camera* pursuant to N.Y. C.P.L. § 680.10. (*Id.* at 128).  The defense

contended that *in camera* review would alleviate any prejudice to the People. (*Id.*). The court reserved decision to afford Cincotta time to speak with Spanos. (*Id.* at 137).

Although not preserved in the trial record, a March 11, 2013 colloquy between defense counsel and the court referenced the fact that the court had denied the defense's N.Y. C.P.L. § 650.20 motion. (*See* Docket No. 17-1 at 292). The record indicates that the court's decision was based on Cincotta's representation that she "spoke directly with [Spanos's] attorney in Vermont, and the attorney made it very clear that she would recommend, and most likely [Spanos] would follow her recommendation," to invoke his Fifth Amendment right and decline to come to court. (*Id.* at 292–93). The defense renewed its N.Y. C.P.L. § 680.10 motion seeking to admit Spanos's testimony via a commission. (*Id.* at 291). The court did not adjudicate the motion and the record does not make further mention of it.

Petitioner's claim on habeas review challenges the trial court's decision not to compel Spanos's attendance based on representations to the court that Spanos would invoke his privilege against self-incrimination if called to testify. Spanos never actually invoked his Fifth Amendment privilege. Petitioner's claim does not concern "clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d). For AEDPA purposes, clearly established federal law includes only the holdings of the Supreme Court's decisions. *See Woods v. Donald*, 575 U.S. 312, 316 (2015). Supreme court dicta, circuit precedent, or "of course, . . . state-court decisions, treatises, or law review articles," are not "clearly established" federal law. *See id.*; *Kernan v. Cuero*, 138 S.Ct. 4, 9 (2017).

The Supreme Court has not resolved whether a trial court's refusal to compel the attendance of a witness who indicates an intention to invoke his privilege against self-incrimination — but does not formally assert the privilege — runs afoul of the Sixth Amendment. Thus, Supreme Court precedent does not "clearly *require* the state court" to

compel the attendance of a witness under these circumstances. *See Kernan*, 138 S.Ct. at 6. To the contrary, the circuit courts that have ruled on the issue have upheld a trial court's declination to compel a witness's attendance where that witness expresses that they will invoke their Fifth Amendment privilege if subpoenaed. *See, e.g.*, *Bowles v. United States*, 439 F.2d 536, 541 (Fed. Cir. 1970) (upholding trial court's refusal to compel attendance of a witness who indicated he would invoke his privilege against self-incrimination); *United States v. Gay*, 567 F.2d 916, 918 (9th Cir. 1987) (Sixth Amendment was not violated where trial court declined to compel a witness who indicated an intention to invoke his Fifth Amendment right). Accordingly, as the Appellate Division's ruling does not concern an issue of clearly established federal law, the Court cannot conclude that the Appellate Division's ruling was contrary to, or an unreasonable application of such law. *See id.* at 9. Thus, the Court respectfully recommends that Petitioner's Compulsory Process Clause claim be dismissed.

## IV. CONCLUSION

For the foregoing reasons, I conclude and respectfully recommend that the Petition be denied. Further, because reasonable jurists would not find it debatable that Petitioner has failed to demonstrate by a substantial showing that he was denied a constitutional right, I recommend that no certificate of appealability be issued. *See* 28 U.S.C. § 2253(c); *Slack v. McDaniel*, 529 U.S. 473, 483–84 (2000).

The Clerk of Court is requested to mail a copy of this Report and Recommendation to the *pro se* Petitioner.

## V. NOTICE

Pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 8(b) of the Rules Governing Section 2254 Cases in the United States District Courts, the parties shall have fourteen (14) days from the receipt of this Report and Recommendation to serve and file written objections. If copies of this

Report and Recommendation are served upon the parties by mail, the parties shall have seventeen (17) days from receipt of the same to file and serve written objections. *See* Fed. R. Civ. P. 6(d). Objections and responses to objections, if any, shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable Cathy Seibel at the United States District Court, Southern District of New York, 300 Quarropas Street, White Plains, New York 10601, and to the chambers of the undersigned at the same address.

Requests for extensions of time to file objections must be made to the Honorable Cathy Seibel and not to the undersigned. Failure to file timely objections to this Report and Recommendation will preclude later appellate review of any order of judgment that will be rendered. *See* 28 U.S.C. § 636(b)(1); *Caidor v. Onondaga Cnty.*, 517 F.3d 601, 604 (2d Cir. 2008).

Dated: April 26, 2021
      White Plains, New York

**RESPECTFULLY SUBMITTED,**

*Judith C. McCarthy*

JUDITH C. McCARTHY
United States Magistrate Judge

No objections to this Report and Recommendation (the "R&R") have been received, so I review it for clear error. The R&R is hereby adopted as the decision of the Court, except for the finding on page 19 that Petitioner's presence could not have meaningfully contributed to the subject of the improper *ex parte* conference. This was not a situation, like the cited case *Figueroa*, where the defendant was absent from a conference but his lawyer was present. Here not even Petitioner's lawyer was present, and the lawyer likely could have meaningfully contributed. Nevertheless, for the remaining reasons set forth by Magistrate Judge McCarthy, I agree that there was no prejudice and that the presence of Petitioner or his counsel at the *ex parte* conference would not have affected the outcome. Accordingly, the Petition is denied. Because reasonable jurists would not find it debatable that Petitioner has failed to make a substantial showing that he was denied a constitutional right, no certificate of appealability will issue. *See* 28 U.S.C. 2253(c); *Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000). The Clerk of Court is respectfully directed to send a copy of this endorsement to Petitioner and to close the case.

SO ORDERED.

-29-

*Cathy Seibel*

CATHY SEIBEL, U.S.D.J.

5/26/21